IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| DUANE E. POTTS<br><br>Plaintiff,<br><br><br>vs.<br><br><br>DAVIS COUNTY, ET AL.<br><br>Defendants, | MEMORANDUM DECISION<br><br>AND ORDER<br><br><br><br>Case No. 1:02-CV-00004<br><br>Judge Dee Benson |

Plaintiff Duane Potts, a former Sergeant with the Davis County Sheriff's Department, brought this § 1983 action against Davis County, the Davis County Sheriff's Office, Davis County Sheriff Bud Cox, and Chief Deputy Sheriff Kevin McLeod. Plaintiff alleges that the defendants terminated his employment in violation of his procedural and substantive due process rights. Defendants have moved for summary judgment on each of plaintiff's claims. Additionally, the individual defendants assert they are entitled to summary judgment on all claims under the doctrine of qualified immunity.

1

## BACKGROUND

In January of 1999 defendant Bud Cox ("Sheriff Cox") became the Sheriff of Davis County.  (Ex. E, Cox Dep. at 3.)  Defendant Kevin McLeod ("Chief McLeod"), a deputy Sheriff employed by Davis County, has served as chief deputy since January of 1999.  (Ex. B, McLeod Dep. Vol. I at 70.)  Lieutenant Kelly Sparks ("Lt. Sparks") has been a deputy sheriff for the Davis County Sheriff's Department since 1983.  (Ex D, Sparks Dep. at 3-4.)

Plaintiff Duane Potts began his employment with the Davis County Sheriff's Department in August of 1977.  (Ex. C, Potts Dep. at 29-30.)  In 1984 Potts was promoted to the rank of sergeant and he continued to hold that rank until January 7, 2001.  (Id.)  During his time with the Davis County Sheriff's Department, Potts served in several different assignments.  (Id. at 30-35.)  In 1992 Potts became a paramedic and a patrol sergeant, supervising seven to ten paramedic deputy sheriffs.  (Id. at 34-35, 40-41.)

On December 16, 1999, Chief McLeod directed Lt. Sparks to conduct an internal affairs investigation of Potts' activities.  (Ex. A, CSC Decision at 1.)  Lt. Sparks met with Potts on December 22, 1999, and informed Potts that he was the subject of an internal affairs investigation.  (Ex. C, Potts Dep. at 60-63.)  During that meeting, Lt. Sparks provided Potts with a one-page memorandum outlining the allegations against Potts.  (Ex. 5, Dec. 22, 1999 Mem.)  The allegations included: (1) creating an intimidating and hostile work environment; (2) dereliction of duty and malfeasance of duty; (3) criticism of and failure to support other units of the Sheriff's Office and other Davis County law enforcement agencies; and (4) soliciting gratuities in exchange for special consideration. (Id.)  The memorandum further explained that

3

"[t]his investigation may also include any other misconduct or policy violations discovered in the course of this investigation."  (Id.)  The memorandum did not include any facts to support the allegations.  As part of his investigation, between December 22, 1999 and January 20, 2000, Lt. Sparks interviewed several Sheriff's Department employees about Potts.  (Ex. 7, Interview Notes.)  In addition, Potts' supervisor, Lt. Fluckiger, provided Lt. Sparks with a memorandum outlining Lt. Fluckiger's concerns with Potts' conduct.  (Ex. 6, Dec. 23, 1999 Mem.)

On January 20, 2000, Lt. Sparks interviewed Potts regarding the allegations in the December 22, 1999 Memorandum.  (Ex. C, Potts Dep. at 70; Ex. 8, Potts Interview Jan. 20, 2000.)  At the outset, Lt. Sparks explained that he intended to go through each of the allegations and give Potts an opportunity to respond to the information he had gathered through the various interviews and his investigation.[1]  (Ex. 8, Potts Interview Jan 20, 2000 at DA-00323.)  During the interview Lt. Sparks and Potts discussed a variety of complaints asserted by members of Potts' crew and fellow officers.  Although Lt. Sparks was hesitant to identify those who made the complaints, Lt. Sparks and Potts did discuss specific individuals and incidents.  Following the January 20, 2000 interview, Lt. Sparks drafted a Detailed Report, setting forth the findings of his investigation.  (Ex. 9, Detailed Report.)  Lt. Sparks also prepared an Investigative Summary of his findings.[2]  (Ex. 10, Investigative Summary.)

_____

[1]The January 20, 2000 interview was partially recorded and transcribed by the Sheriff's Office.  The written transcript ends abruptly, stating:  "Nothing recorded on side two."  (Ex. 8, Potts Interview Jan. 20, 2000 at DA-00350.)

[2]Potts disputes the accuracy of Lt. Sparks' Report and Summary.  Specifically, Potts takes issue with Lt. Sparks' characterization of the conversation regarding his alleged acceptance of a palm pilot from a subordinate in exchange for a favorable assignment.  Potts maintains that he never accepted a palm pilot and that he never indicated otherwise during the interview.  To

On January 28, 2000, Sheriff Cox and Chief McLeod met with Potts and his attorney in a pre-disciplinary conference.  (Ex. C, Potts Dep. at 143-45.)  The pre-disciplinary conference was recorded and transcribed.  (Ex. 13, Pre-Discipline Discussion.)  At the beginning of the meeting Chief McLeod gave Potts a four-page Pre-Disciplinary Discussion Letter which outlined the allegations against Potts and included a brief summary of the investigative findings that supported each allegation.  (Ex. 11, Pre-Disciplinary Letter.)  Included with the letter was a file of supporting documents.  Chief McLeod assured Potts and his attorney that the file contained the policies and procedures that provided the basis for the investigation and did not include any personal statements from witnesses.  (Ex. 13, Pre-Discipline Discussion at 2, ¶2.)

After receiving the Pre-Disciplinary Discussion Letter and accompanying file, Potts' attorney replied, "maybe you ought to give us an hour or two so we can go look at it."  (Id. at 1.)  Sheriff Cox granted the request and assured them that "there was nothing in that document that [Potts] hasn't talked about already with an investigator."  (Id. at 3.)  Potts and his counsel took time to review the Pre-Disciplinary Discussion Letter and Potts acknowledged by his signature that he had reviewed the document.  (Ex. 11, Pre-Disciplinary Letter.)  Chief McLeod explained to Potts and his counsel that the conference was "an opportunity for [Potts] to tell us his side, or give us information from his point of view, on those allegations."  (Ex. 13, Pre-Discipline Discussion at 3.)  Chief McLeod stated: "At the end of this discussion, whatever information I have will be used to make our decision."  (Id. at 14.)

---

support his position, Potts relies on his own complete recording of the January 20, 2000 interview.  (CSC Decision at 11, ¶15.)  Lt. Sparks has acknowledged that he relied exclusively on his recollection in drafting his Report and Summary, and that "[Potts'] tape did not contain some of the conversation which [he] remembered."  (CSC Decision at 11, ¶14.)

Throughout the conference, Potts' attorney requested additional time to prepare a formal written response including statements from witnesses.  Chief McLeod explained that there was "no right or reason for confrontation of witnesses at this time," and this was merely a discussion. (Id. at 2.)  Chief McLeod explained, "if [Potts] has information that will help us make a decision on any of these issues, on his behalf, that's what this discussion is for."  (Id. at 14.)  Relying on the advice of counsel, Potts declined to provide any significant response.  Potts' attorney stated that he would take the information, "go back" and prepare a response, and "you can take it or not."  (Id. at 15.)

Five days later, on February 2, 2000, Chief McLeod met with Potts and informed him that his employment was being terminated.  (Ex. C, Potts Dep. at 151-53.)  Chief McLeod also gave Potts a memorandum entitled "Notice of Disciplinary Action," setting forth the factual findings that led to the decision.  Potts' employment was terminated based on six alleged policy violations: (1) Receiving a palm pilot from a subordinate deputy in exchange for a special assignment and providing false information about this subject during the course of the investigation; (2) Failing to keep his crew staffed at a minimum level; (3) Discouraging employees from responding to calls for assistance from the Narcotics Strike Force and referring to the strike force as "the enemy;" (4) Requiring his crew to leave assigned areas to attend meetings at 7-11; (5) Spending an inordinate amount of time in inactive capacity; and (6) Acts of verbal abuse, abusive language, threats and intimidation of subordinates.  (Ex. 12, Notice of Disciplinary Action.)

Potts appealed his termination to the Career Services Council ("CSC").  Hearings were

held on March 27, 2000 and July 21, 2000.  (Ex. A, CSC Decision.)  During the hearings, the

defendants stipulated that three of the six violations (failing to ensure crew was staffed at a

minimum level; requiring crew to leave assigned areas to attend meetings at 7-11; and spending

an inordinate amount of time in an inactive capacity) would not be pursued as reasons for

termination.  (Id. at 2, ¶ 4.)  On July 27, 2000, the CSC issued its Findings of Fact, Conclusions

of Law, and Decision.  The CSC decision concluded that "the Sheriff's Office failed to establish

that any of the three remaining charges actually occurred as stated in the Pre-disciplinary and

Disciplinary documents."  (Id. at 15.)  In light of this conclusion, the CSC reversed the decision

to terminate Potts' employment.  (Id.)

On July 28, 2000, Chief McLeod telephoned Potts and told him to report to work on

August 3, 2000 in his Class A uniform.  (Ex. C, Potts Dep. at 161-62.)  Lt. Sparks informed Potts

that he had been reassigned to the courts and should report to Lt. Fielding.  (Id.)  Potts told Chief

McLeod that he was under a lot of stress and would not be able to return to work at that time.

(Id. at 162.)  Lt. Sparks requested a letter from Potts' doctor.  (Id.)

On August 2, 2000 Potts provided Davis County with a note from Dr. John B. Taylor

stating that Potts had "depression secondary to a job action at the Davis County Sheriffs

Department.  He has been [reinstated] to a similar job but I medically do not think he should

return to the area of work that cause[d] the depression initially."  (Ex. 15, Dr. Taylor Letter, Aug.

1, 2000.)  On August 17, 2000 and August 29, 2000, Potts underwent a fitness for duty

evaluation.  Following receipt of the results, Chief McLeod notified Potts that he had been found

fit to return to work, and ordered Potts to report to Lt. Fielding for duty on September 18, 2000.

(Ex. 16, Fit for Duty Report; Ex. G, McLeod Letter to Potts, Sept. 13, 2000; Ex. C, Potts Dep. at 171-72.)

Sheriff Cox was responsible for making the decision to reassign Potts to the courts.  (Ex. E, Cox Depo. at 25.)  In making that decision Sheriff Cox and Chief McLeod "considered all that had happened" during the course of the investigation and believed it would be difficult for Potts to be effective as a supervisor in the patrol division.  (Ex. E, Cox Depo. at 24-25; Ex. B, McLeod Dep. Vol. II at 15-17.)  Chief McLeod expressed specific concern over allowing Potts to return in a supervisory role over people who had "reported things and made statements not in [Potts'] best interest."  (Ex. B, McLeod Dep. Vol. II at 15.)

Potts objected to his reassignment, but reported for duty "under protest" on September 18, 2000.  (Ex. H, Hoole Letter to Hess, Sept. 15, 2000; Ex. C, Potts Dep. at 172-75, 180).  Initially, Potts did not have a supervisory position.  However, after a few weeks he was assigned to supervise one or two transportation deputies in the civil division.  (Potts Aff. ¶ 29; Ex. C, Potts Dep. at 195.)  Following his reinstatement, Potts received all of his back salary for the period of time between February 2, 2000 and his reinstatement on August 3, 2000.  (Ex. C, Potts Dep. at 180-81.)[3]

_____

[3]Initially, Potts' back pay did not include any of the 4% differential pay for the periods of time he would have worked the graveyard shift.  However, when Potts brought this to McLeod's attention, McLeod acknowledged that Potts should have been paid his 4% differential for the months of March, April, July, and August 1-3, and McLeod made a request for the Personnel Director to issue payment.  (Ex. L, McLeod Mem. to Potts, Nov. 17, 2000.)  Potts does not recall having received his differential pay and initially disputed the fact that he had received it. However, Potts has indicated that "to the extent the Department can confirm that back differential pay was paid through the date of his reinstatement, Potts will withdraw his dispute as to this factual assertion."  (Pl.'s Mem. in Opp'n of S.J. at xxxvii.)

Potts' post-reinstatement rank and salary remained the same as his rank and salary prior to his discharge on February 2, 2000.  (Ex. C, Potts Dep. at 30, 192.)  Potts also received the same benefits after his reinstatement as he had prior to February 2, 2000, with the exception that he did not have a county vehicle to drive for a couple of weeks.[4]  (Id. at 192.)  However, Potts' reassignment to the Davis County Complex foreclosed the opportunity for Potts to earn differential pay for night shift rotations.

During the following weeks, Potts, either personally or through counsel, continued to contact the defendants, expressing dissatisfaction with his reassignment to the courts and requesting that he be reinstated to his former position as patrol crew supervisor.  (Ex. J, Hoole Letter to Hess, Nov. 2, 2000; Ex. K, Hoole letter to Hess, Nov. 24, 2000; Ex. L, Potts Mem. to McLeod, Nov. 27, 2000.)  Following his reinstatement, Potts felt as though he did not have the support of the Sheriff's Office.  (Potts Aff. ¶ 42.)  As part of his new assignment, Potts occasionally had to serve protective orders.  Despite his requests for backup, it was not provided.  (Potts Aff. ¶ 45.)

On December 14, 2000, Potts received a voice mail message on his phone at work.  The message had been left at 8:07 p.m. the previous evening.  The message is, for the most part, garbled and unclear with the exception of laughter.  The only semi-intelligible words consist of someone laughing while saying "he's gonna die."  (Ex. N, Cassette Tape.)  Potts perceived the message as a death threat from someone in the police department.  (Potts Aff. at ¶ 50; Ex. C,

---

[4]Although Potts received a county vehicle within two weeks of his reinstatement, he objected to the fact that it was not a police car, equipped with lights, a siren, and paramedic equipment.  (Potts Aff. ¶ 44; Ex. C, Potts. Dep. at 192, 194.)

Potts Dep. 201-02.)  Potts believed the message had come from inside the Sheriff's Department because his work telephone number was not available to the public and he had not provided his extension to anyone outside of law enforcement.  (Pl.'s Mem. in Opp'n to S.J. at xl.) Additionally, because the call was received after hours, the caller would have needed to know Potts' extension to get his voice mail, and would have heard Potts' name and greeting prior to leaving the message.  (Id.)

Potts told his supervisor, Lt. Fielding, about the voice mail message and told Fielding that he believed it came from someone in the Sheriff's Department administration.  (Ex. C, Potts Dep. at 212.)  Chief McLeod listened to the message and did not perceive it to be a death threat. Due to the laughing and joking in the background, McLeod thought the message had erroneously been sent by someone at a party.  (Ex. B, McLeod Dep. at 118-20.)  Nonetheless, Chief McLeod had Lt. Fielding investigate the call to see if it could be traced, but the county's telephone system did not have the capability to do so.  (Ex. B, McLeod Dep. at 102-04.)

Four days after receiving the alleged death threat, approximately December 18, 2000, Potts took an unplanned vacation.  Potts returned to work on January 7, 2001 at 8:30 a.m. and told his supervisor he had a doctor's appointment.  (Ex. C, Potts Dep. at 205.)  Potts' supervisor granted his request for sick leave for the day and Potts left work.  Later that day, the deputy county attorney received a letter from Potts' attorney providing:

> [B]ased on the totality of the circumstances which have developed since Sgt. Potts returned to the Sheriff's Office in September of 2000, he is forced to leave work at this time and will resign his employment with Davis County effective upon the exhaustion of his earned and unused vacation, sick and holiday time.  By my calculation, the effective date of his resignation will be June 9, 2001.

(Ex. 18, Hoole Letter to Hess, Jan. 7, 2001.)  On January 16, 2001, Sheriff Cox sent a

memorandum to Potts, informing him that his voluntary resignation had been accepted, effective

January 8, 2001.

On January 18, 2002, Potts filed the instant action alleging violations of both procedural

and substantive due process.  The defendants have moved for summary judgment as to all

claims.

## DISCUSSION

Summary Judgment is appropriate if there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986); Fed.R.Civ.P. 56(c).  The substantive law determines which facts are material.

"Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or

unnecessary will not be counted."  Anderson v. Libberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court considers the factual record and all reasonable inferences that may be drawn from it in

the light most favorable to the party opposing summary judgment.  MacKenzie v. City and

County of Denver, 414 F.3d 1266, 1273 (10th Cir. 2005).

## I.    Procedural Due Process

"The requirements of procedural due process apply only to the deprivation of interests

encompassed by the Fourteenth Amendment's protection of liberty and property."  Board of

Regents v. Roth, 408 U.S. 564, 569 (1972).  The Tenth Circuit has held that "procedural due

process insures that a state will not deprive a person of life, liberty or property unless fair

procedures are used in making that decision."  Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998).  Potts claims that defendants deprived him of both his property interest in his employment and his liberty interest in his good name and reputation without due process of law.

This Court follows a two-step inquiry to determine whether there has been a deprivation of procedural due process.  The Court must first determine whether the plaintiff had a protected property or liberty interest that would trigger due process protection; if so, the Court must then determine as a matter of law whether there was an appropriate level of process afforded to the plaintiff.  See Watson v. University of Utah Med. Ctr., 75 F.3d 569, 577 (10th Cir. 1996).

### A.   Property Interest in Continued Employment

The defendants concede, for purposes of the motion for summary judgment, that Potts enjoyed a protected property interest in his continued employment with the Sheriff's Department.  The question then becomes whether Potts was afforded an appropriate level of process.  See id.

"[S]ome kind of hearing [is required] prior to the discharge of an employee who has a constitutionally protected interest in his employment."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).  This necessary pre-termination hearing "need not be elaborate" and "something less than a full evidentiary hearing will suffice."  Id.  At a minimum, the plaintiff is "entitled to oral and written notice of the charges against him, an explanation of the employer's evidence and an opportunity to present his side of the story."  Id.

Moreover, where there are adequate post-termination procedures, "a plaintiff is not entitled to an extensive or formal pre-termination hearing."  Hennigh, 155 F.3d at 1256 (quoting

Benavidez v. Albuquerque, 101 F.3d 620, 627 (10th Cir. 1996)); see also Loudermill, 470 U.S. at 546 ("To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.").  "Because it is followed by post-termination proceedings, the pre-termination hearing is not meant to resolve definitively the propriety of the charge, but only to determine whether there are reasonable grounds to believe the charges are true and action is correct."  Benavidez, 101 F.3d at 627.

### 1.        Pre-Termination Process

Potts claims the pre-termination process in this case failed to meet each of the minimum requirements set forth in Loudermill.  First, Potts claims that notice was deficient because the allegations against him were set forth in general terms, without factual support, rendering him unable to prepare an adequate response.  Second, Potts claims the evidence was not explained to him prior to the pre-termination hearing.  Third, Potts claims he was not provided with a reasonable opportunity to respond to the charges.

The facts indicate that on December 22, 1999, Potts received oral and written notice that Lt. Sparks was conducting an internal affairs investigation relating to four enumerated charges. The memorandum of that meeting was signed and acknowledged by Potts, and at a minimum provided notice of the investigation and general notice of the allegations against him.

On January 20, 2000, following the internal affairs investigation, Potts was given further notice of the charges and an opportunity to respond during the interview conducted by Lt. Sparks.  At the beginning of the interview, Lt. Sparks told Potts that they would "go through each of those allegations and give [Potts] an opportunity to respond to what [Sparks had] been

told" during the investigation.  The transcript reveals a thorough discussion, including specific names and incidents regarding various allegations made by Potts' crew and fellow officers.

A third pre-termination meeting occurred on January 28, 2000 between Potts, his attorney, and defendants Cox and McLeod.  At the outset, Potts was once again given a letter reciting the allegations against him.  When Potts' attorney asked for "an hour or two" to review the letter and accompanying file, his request was granted.  Thereafter, Potts acknowledged by his signature that he had reviewed the documents.  During this meeting, Chief McLeod told Potts and his attorney that this "was an opportunity for [Potts] to tell us his side, or give us information from his point of view, on those allegations."  Although Potts, relying on the advice of counsel, declined to discuss in any significant detail many of the allegations, he was nonetheless provided an opportunity to do so.

These facts demonstrate that through the various meetings Potts was given notice of the charges against him, an explanation of the employer's evidence, and an opportunity to tell his side of the story as required by <u>Loudermill</u>, 470 U.S. at 545. Therefore, the pre-termination procedures provided Potts with an appropriate level of process.

### 2.        Post-Termination Process

However, even if the pre-termination procedures were somehow deficient, the adversarial post-termination evidentiary hearings before the CSC unquestionably provided Potts the requisite procedural due process.  With the assistance of legal counsel, Potts appealed the Sheriff's Department's decision to terminate his employment.   He was given sufficient time to prepare and then presented favorable witnesses and proffered their testimony as evidence that the

charges could not be substantiated.  See Calhoun v. Gaines, 982 F.2d 1470, 1476-77 (10th Cir.

1992) ("Loudermill also established that, in cases where the pre-termination is less elaborate, a

full-blown, adversarial post-termination hearing, held at a meaningful time, is necessary to

determine the ultimate propriety of the discharge.").

      The fact that Potts was successful in reversing the Sheriff's Department's decision and

obtaining reinstatement of his employment further demonstrates that the post-termination

procedures were effective and adequate.  The Tenth Circuit has held that a plaintiff cannot state a

claim under § 1983 for loss of a constitutionally protected property interest in employment

"when a procedurally adequate post-termination hearing actually results in reinstatement

together with back pay for the temporary deprivation of employment."  Workman v. Jordan, 32

F.3d 475, 483 (10th Cir. 1994) (citing Archuleta v. Colorado Dep't of Institutions, 936 F.2d 483

(10th Cir. 1991)).  Although Potts alleges a long list of procedural defects during the investigation

and pre-termination hearing, the fact of his reinstatement remains.  Id. ("We find it difficult to

evaluate any grievance procedure as inadequate when the employee was reinstated and given full

back pay.").  Accordingly, the Court finds as a matter of law that Potts was not deprived of a

protected property interest in his employment without procedural due process.[5]

### B.    Liberty Interest in Good Name and Reputation

      Potts also claims that the defendants deprived him of his liberty interest in his good name

and reputation without due process.  Potts' liberty claim is based on damage to his reputation as

---

[5]Potts' claim that the Sheriff's Department treated the CSC decision as a nullity is
unfounded.  Following the CSC decision Potts was reinstated and given back pay due from the
time of his termination through his reinstatement.  Had the Sheriff's Department treated the CSC
decision as a nullity, Potts would not have been invited to return to work.

a police officer allegedly due to the stigmatizing effect of the internal affairs investigation and the subsequent decision to terminate his employment.

It is well established in the Tenth Circuit that a public employee has "a liberty interest in his good name and reputation as it affects his protected property interest in continued employment." Workman v. Jordan, 32 F.3d 475, 480 (10th Cir. 1994). To demonstrate a deprivation of that liberty interest, a plaintiff must satisfy the following four-part test.

> First, to be actionable, the statements must impugn the good name, reputation, honor or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published.

Workman, 32 F.3d at 481 (citations omitted); see also Melton v. City of Oklahoma City, 928 F.2d 920, 926-27 (10th Cir.) (en banc) (emphasizing that elements are not disjunctive and all must be satisfied), cert. denied, 502 U.S. 906 (1991). If all of the above elements are established, then the due process clause requires an adequate name-clearing hearing. Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 526 (10th Cir. 1998).

The Court need not address whether Potts has alleged facts sufficient to establish a deprivation of his liberty interest, thereby triggering a name-clearing hearing, because Potts was, in any event, provided with such a hearing before the CSC. As explained in detail above, at the CSC hearing, with the benefit of counsel, Potts was afforded an adequate opportunity to refute the charges, clear his name, and address any stigmatizing comments. Once again, the procedural protections of the post-termination hearing, combined with the ultimate fact of Potts' reinstatement, demonstrate that Potts received an adequate name-clearing hearing.

Potts relies on Melton v. City of Oklahoma City, 879 F.2d 706 (10th Cir. 1989), to

support his claim that the name-clearing hearing was defective.  Potts asserts that he was unable

to clear his name as to three of the charges because the Sheriff's Department dropped them prior

to the hearing.  Potts' reliance on Melton is misplaced.

In Melton, the plaintiff was the subject of a highly publicized investigation alleging (1)

violation of the police code of ethics for disclosing confidential information, and (2) perjury.  At

the disciplinary hearing, the perjury charge was dropped and the board relied exclusively on the

ethics violation in deciding to terminate the plaintiff's employment.  On appeal, the Tenth

Circuit found that the board's dismissal of the perjury charge, prior to the hearing, precluded the

plaintiff from receiving the necessary name-clearing hearing.  Id. at 722.  The court explained

that, given the publicity concerning the perjury charge and the generalized nature of the stated

reason for dismissal (violation of the Ethics Code), it was "reasonable to conclude that the public

may have been left with the impression that the officer's dismissal was based in part on the

perjury charge."  Id.  Accordingly, the Tenth Circuit concluded that the plaintiff had been

deprived of his liberty interest without due process.  Id.

In the present case, however, unlike the plaintiff in Melton, who was terminated

following the hearing, Potts was reinstated with full back pay and benefits.  Because Potts was

reinstated, the specific harm that the Melton court sought to avoid (an erroneous conclusion that

plaintiff's termination was based on the dropped charge) is not present.  In fact, to apply the

reasoning set forth in Melton to the facts of this case would suggest the possibility of a favorable

conclusion–that Potts was reinstated because he had been cleared on all charges.

In light of these facts, the Court finds that Potts was provided with a procedurally

adequate due process hearing to clear his name.  Therefore, Potts' liberty interest claim fails as a matter of law.

## II.   <u>Substantive Due Process</u>

While procedural due process ensures the state will not deprive a party of property without engaging in fair procedures, "substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." <u>Hyde Park Co. v. Santa Fe City Council</u>, 226 F.3d 1207, 1210 (10th Cir. 2000). "Substantive due process requires only that termination of a protected interest not be arbitrary, capricious, or without a rational basis." <u>Hennigh v. City of Shawnee</u>, 155 F.3d 1249, 1257 (10th Cir. 1998).  Potts claims that the defendants violated his substantive due process rights in the following ways.  First, Potts alleges there was no rational basis for depriving him of his differential pay and position as a patrol sergeant.  Second, Potts alleges there was no rational basis for depriving him of his employment, following his reinstatement, by forcing him to resign.

### A.   **Property Interest in his Pay and Position**

Potts alleges that defendants violated his substantive due process rights by depriving him of the opportunity to earn differential pay and depriving him of his position as a patrol sergeant.[6] As with procedural due process, to prevail on a substantive due process claim, "a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest." <u>Hyde Park</u>, 226 F.3d at 1210.

_____

[6]Because the opportunity to earn differential pay is a benefit that accompanied Potts' position as a patrol officer, these arguments are inexorably linked.

18

Potts claims that the language of  U.C.A. § 17-30-18, which limits the circumstances under which a merit system employee can be "reduced in pay," includes not only his salary, but also the differential pay patrol officers receive for working night shifts.  However, aside from this general reference to "pay" in § 17-30-18, Potts has failed to provide any authority supporting his claim of a protected property interest in the opportunity to earn differential pay.  In fact, courts have routinely found, based on merit systems similar to the one in this case, that employees do not have a protected property interest in overtime opportunities.  See, e.g., Altman v. Hurst, 734 F.2d 1240, 1244  (7th Cir.) (concluding that police officer had no protected property interest in job assignments, overtime opportunities, and promised vacation dates), cert. denied, 469 U.S. 982 (1984); Brown v. Brienen, 722 F.2d 360, 365 (7th Cir. 1983) (Posner, J.) ("[D]isputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objectives of the Fourteenth Amendment."); Boyd v. Schembri, 1997 WL 466539, at *3 (S.D.N.Y. Aug. 13, 1997) (finding police officer had no protectable property interest in overtime).

Similarly, with regard to Potts' claim of a protected property interest in his position as a patrol supervisor, "the general rule is that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary." Hulen v. Yates, 322 F.3d 1229, 1240 (10th Cir. 2003).  Moreover, although the merit system defines the circumstances under which an officer may be demoted, suspended, reduced in pay, or discharged, see § 17-30-18, this Court has previously held that the merit system does not place any meaningful limits on the sheriff's discretion to transfer officers.

Miller v. Kennard, 74 F.Supp.2d 1050, 1064 (D. Utah 1999); see also U.C.A. § 17-30-13 ("A merit system officer may be transferred, without examination, from one position to a similar position in the class and grade in the same governmental unit.").

However, even if Potts could establish a protected property interest in his position as a patrol officer or the accompanying opportunity to earn differential pay, the defendants had a rational basis for transferring Potts from patrol to the courts. Sheriff Cox and Chief McLeod both expressed concerns that it would be difficult for Potts to be effective as a supervisor in the patrol division after all that occurred during the course of the investigation. Lt. Sparks expressed specific concern over allowing Potts to return in a supervisory role over subordinates who had complained about Potts.

Moreover, Potts' own doctor's assessment initially recommended that Potts should not return to his former position in patrol. Although Dr. Taylor's letter was received after Potts had been reassigned, it nonetheless provides support for the conclusion that the decision to reassign Potts was not arbitrary. Moreover, although Potts claims Dr. Taylor inaccurately concluded "that his work as a Patrol Sergeant . . . caused his stress," (Pl.'s Mem. In Opp'n at xxxiii), "the Due Process Clause does not protect against 'wrong' decisions, only arbitrary ones." Garcia v. City of Albuquerque, 232 F.3d 760, 771 (10th Cir. 2000). Accordingly, the defendants' reliance on the doctor's assessment that Potts should not be returned to his former position was not arbitrary, even if the recommendation was not medically compelled. See id.

Because the decision to transfer Potts from patrol to the courts had a rational basis, the Court finds that Potts was afforded substantive due process.

**B.**     **Constructive Discharge**

Finally, Potts claims that following his reinstatement he was constructively discharged without due process of law.  Potts alleges that the defendants used a number of tactics to force him to quit, including transferring him to the courts, foreclosing his opportunity to earn differential pay, failing to provide him with a police car, failing to provide backup when he had to serve protective orders, and refusing to investigate a threat on his life.  (Pl.'s Mem. In Opp'n at 11-12.)

A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.  Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004).  Working conditions must be so severe that the plaintiff simply had no choice but to quit.  Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1357 (10th Cir. 1997), cert. denied, 523 U.S. 1074 (1998).  However, if a plaintiff resigns of his own free will, even as a result of the defendants' actions, then he voluntarily relinquishes his property interest and has not been deprived of property without due process of law.  Id. at 1356; see Exum v. U.S. Olympic Committee, 389 F.3d 1130, 1135 (10th Cir. 2004) (providing a plaintiff who voluntarily resigns cannot claim he was constructively discharged).

"The question is not whether the working conditions at the facility were difficult or unpleasant."  Exum, 389 F.3d at 1135.  "It is not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world."  Id. (quoting Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003)).  Rather, the plaintiff

must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship.  Id.  The Court determines the voluntariness of an employee's resignation under an objective standard, looking to whether his working conditions were so intolerable that a reasonable employee would have had no other choice but to quit.  Id. at 1135-36.

In the present case, the tactics of which Potts complains, while cause for disappointment or frustration, were not so serious as to give a reasonable person no other choice but to resign. For example, the fact that Potts was unhappy with his transfer to the courts and perceived it as a demotion does not amount to an intolerable work environment.  See Hahn Ho Tran v. Trustees of the State Colleges in Colo., 355 F.3d 1263, 1267 (10th Cir. 2004) (providing that although plaintiff was unhappy with her transfer to a position for which she was unqualified "did not create a situation that was so intolerable that a reasonable person would feel she had no other choice but to resign").  Similarly, the fact that Potts was not placed in a supervisory position or in a position requiring EMT skills and a police vehicle is also insufficient to support a claim that defendants deprived him of his free will regarding his employment.  See Baca v. Sklar, 398 F.3d 1210, 1213 (10th Cir. 2005) (providing that even if supervisor took retaliatory actions, including removal of supervisory responsibilities, and "even if his sour relationship with [the supervisor] may have made quitting [his] best option, [plaintiff  had] not presented a genuine issue of material fact as to whether he had no choice but to quit").

With regard to the alleged death threat, the record indicates that although Chief McLeod doubted the seriousness of the threat, he nonetheless asked Lt. Fielding to investigate the call.

22

As for the message itself, the court finds that the recording is largely unintelligible with the exception of someone saying, through laughter, "he's gonna die."  Although the remaining dialogue is indecipherable, it appears to be a conversation between the caller and his companions and not intended as message.  Moreover, the recording reveals laughter and fails to convey the tone one would typically associate with a death threat.  Finally, there is no evidence indicating the source of the message, the identity of the caller, and whether Potts was the intended recipient.  Based on these facts, the court declines to conclude that this isolated message created an intolerable working environment.

Even when viewed in a light most favorable to Potts, the foregoing facts fail to establish that Potts was left no other choice but to resign.  Accordingly, the court finds that Potts' resignation was voluntary, albeit as a result of unpleasant and difficult circumstances, and therefore he was not deprived of due process.

## III.    Qualified Immunity

The individual defendants also raise qualified immunity as a defense.  Because the Court finds that no constitutional violation occurred, it need not reach the issue of qualified immunity. Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006); Taylor v. Meacham, 82 F.3d 1556, 1564 (10th Cir.) ("[C]onclud[ing] that [because] no constitutional right was violated, . . . we proceed no further on the qualified immunity issue."), cert. denied, 519 U.S. 871 (1996).

## CONCLUSION

For the reasons given above, the defendants' motion for summary judgment is granted. This case is dismissed with prejudice in its entirety, each party to bear its own costs.  The Clerk

of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED

      DATED this  _21st_  day of May, 2007.

_____
Dee Benson
United States District Judge